IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHRISTINE LEITGEN, M.D.,

                    Plaintiff,

        v.

FRANCISCAN SKEMP HEALTHCARE, INC.[1]

                  Defendant.

OPINION and ORDER

08-cv-038-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Christine Leitgen is suing defendant Franciscan Skemp Healthcare, Inc. for unlawful sex discrimination and retaliation in violation of §§ 703 and 704 of Title VII of the Civil Rights Act of 1964.  She asserts a claim for sex-based discrimination on the theory that defendant's compensation system has the effect of paying less to women than it should because compensation for delivering babies is shared equally among male and female doctors even though female doctors tend to deliver more babies.  In addition, plaintiff asserts a claim for retaliation on the ground that she was forced to resign after she tried to complain about the gender bias in the compensation system.  Now defendant has filed a motion for summary

---

    [1] Although plaintiff identified defendant as "Franciscan Skemp/Mayo Health System" in its complaint, defendant asserts and plaintiff does not dispute that defendant's proper legal name is Franciscan Skemp Healthcare, Inc.  I have amended the caption accordingly.

judgment, contending that plaintiff's discrimination claim is time-barred and her retaliation claim fails on the merits.  Jurisdiction is present under 28 U.S.C. § 1331.

I agree with defendant and will grant its motion for summary judgment.  Plaintiff failed to respond to defendant's argument that her discrimination claim is time-barred and therefore has waived that claim.  As for plaintiff's retaliation claim, no reasonable jury could find that her complaints about gender bias in the system were causally connected to her forced resignation because the resignation came years after she started complaining about the system and only after a long history of complaints about her inappropriate treatment of nurses and patients.

From the parties' proposed findings of fact, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

### A. Defendant's Compensation System

Plaintiff Christine Leitgen, M.D., was employed at defendant Franciscan Skemp Healthcare, Inc. as a doctor in the department of obstetrics and gynecology from August 1993 until she resigned on November 15, 2006.

Defendant's compensation system for the Department of Obstetrics and Gynecology includes elements of both "pure production" and "shared revenue" compensation.  Under

2

a "pure production" model, each doctor's compensation is determined according to the services provided by that doctor. Defendant compensated doctors for clinic visits and other procedures on a "pure production" model. Under a "shared revenue" model, compensation for the services provided by doctors is pooled and divided among them. Defendant's compensation for delivery of babies was based on a shared revenue model, with compensation for the services divided equally among the doctors. This "shared delivery compensation" scheme existed prior to plaintiff's employment at Franciscan Skemp and continued throughout her employment there.

Because delivery revenue was shared, doctors doing more deliveries received less compensation for their work on a per-delivery basis. Under the department's on-call policy, doctors would take turns serving as an on-call doctor for deliveries. Starting in 2000, female doctors, including plaintiff, started delivering babies during the only male doctor's on-call period. This happened in part because laboring patients more often had a female primary doctor and more often asked their primary doctor to deliver the baby and in part because the female doctors felt "sympathy" for the one male doctor, Dr. Steingraeber. Plaintiff made less under the shared revenue system than she would have under a pure production system.

In 2005, defendant changed its compensation system, adopting the Medicare "relative value unit" as part of the formula for doctor compensation. Under the relative value unit system, particular services are assigned particular values according to the "intensity of

3

services provided." Defendant used the relative value units system "where available." Where a value unit for a particular medical procedure was not available, defendant would create its own value unit. Even after adopting the new system, defendant continued to pool revenues from deliveries, but pooled the "relative value units" assigned to deliveries and distributed them equally among the department's doctors.

### B.  Plaintiff's Opposition to the Compensation System

Between 1993 and 1999, plaintiff raised her concerns about the delivery pay structure to Dr. Young, the chair of the department.  She spoke a number of times with Dr. Young about her concern that the shared delivery component was discriminatory on the basis of gender.  Dr. Young told plaintiff that, according to the chair of the hospital's compensation committee, the shared delivery component had to be changed by the department members. (It is not clear whether the change had to be by unanimous vote or by a simple majority vote.)  During that time, plaintiff never asked for a departmental vote to change the shared delivery revenue component of the compensation system and the matter never came up for a departmental vote.  Between 1999 and 2003, plaintiff was the department chair and a majority of the doctors in the department were female.

The department discussed the shared delivery revenue component two or three times. Although plaintiff was aware that she would have to resolve issues involving the shared

4

revenue component within the department, she did not attempt to change the compensation structure while she was the chairperson.  She and the other female doctors in the department decided "as a group" to "let the system stand for the time being" because they had heard that a new compensation system was coming and they were uncomfortable pressing Dr. Steingraeber, who "had had a long association with the department" and "had served well." Plaintiff and the other female physicians in the department believed that a change in the shared delivery revenue system could have a devastating impact on morale and teamwork. Around the same time, plaintiff started referring to defendant's compensation system as a "pink ghetto," a term she drew from an article discussing disparities in compensation in the context of the "glass ceiling" concept.

In late August 2004, Dr. Edward Sandy was hired to be the new department chair. Within the first couple months of his employment, Dr. Sandy became aware that plaintiff had concerns with the system of sharing revenue for deliveries.  (The parties dispute whether Dr. Sandy knew that plaintiff's concerns with the compensation system included concerns that the system was gender-biased, as opposed to simply unfair to plaintiff because she performed more deliveries than others.  According to plaintiff, Dr. Sandy knew she was complaining about a gender bias.)  Dr. Sandy supported using the shared revenue system for compensating deliveries because he believed that a "pure production" formula provided an inappropriate incentive for doctors to induce labor to increase their revenue.

5

However, Dr. Sandy promised to look into plaintiff's concerns regarding the compensation system. He placed discussion of the delivery revenue system on the agenda for several meetings and circulated articles to the department doctors on the issue of physician compensation. The department held an informational meeting regarding compensation and a second meeting to discuss compensation alternatives. Because both plaintiff and another female doctor, Dr. Keil, had expressed discontent with the compensation system, Dr. Sandy solicited ideas for an alternative method of compensation.

In both 2005 and 2006, plaintiff raised her concerns about gender disparity during her annual performance review. Diane Holmay was present at both of these reviews. At the time, Holmay was vice-president of nursing and patient care and the division of women and children's services. However, she also had a role overseeing plaintiff and doctors in management positions after she became administrator for the women and children's services division in 2001.

On or about August 14, 2006, plaintiff sent an email to Tom Tiggelaar, vice-president of finance for defendant, asking to meet with him to discuss her compensation. About ten days later, Dr. Sandy sent Tiggelaar an email on the issue of compensation. On or about September 5, Tiggelaar met with plaintiff for about an hour and they discussed the shared delivery revenue system. Plaintiff told Tiggelaar that she believed the pooling of delivery revenue had a disproportionate effect on her because she was doing more deliveries than

6

other physicians.  In addition, she stated that she believed that the female doctors were doing a disproportionate amount of deliveries but all doctors were being paid equally for the deliveries.  (The parties dispute whether plaintiff suggested to Tiggelaar that the department had a gender discrepancy that might be considered discriminatory.)  Tiggelaar told plaintiff that any change in the compensation structure would have to be initiated and agreed upon by the department doctors.  Tiggelaar ended the meeting abruptly, promising to get back to plaintiff in several weeks.  He never did.

The day after meeting with plaintiff, Tiggelaar told Dr. Sandy about his meeting with plaintiff.  Although Tiggelaar told Dr. Sandy that plaintiff had complained that the shared delivery revenue system was unfair, he never told Dr. Sandy that plaintiff had complained that the compensation system discriminated against her on the basis of gender.  (Plaintiff attempts to dispute this fact by pointing out that Tiggelaar testifies that he described to Dr. Sandy "the essence" of his conversation with plaintiff.  However, in the same testimony, Tiggelaar explains that the "essence" he relayed to Dr. Sandy was that plaintiff had concerns that the delivery system was unfair to her.)  Tiggelaar also told Dr. Sandy that he had responded to plaintiff by telling her that she was free to discuss her concerns with Dr. Sandy and free to attempt to change the method of compensation within the department.  Within a week, Tiggelaar told Holmay what he had told Dr. Sandy.

Plaintiff also met with Dr. Sandy to discuss the meeting she had had with Tiggelaar.

Dr. Sandy told plaintiff that Tiggelaar had met with him before she met with Tiggelaar and had expressed surprise at how skewed the numbers were among the different doctors.  (The parties dispute whether Dr. Sandy appeared "annoyed" that plaintiff had gone to Tiggelaar about the compensation issue.  In addition, plaintiff suggests that Dr. Sandy "became furious" with her as a result of her meeting with Tiggelaar; however, the evidence she cites fails to establish this fact.  The only testimony about Dr. Sandy's becoming "furious" described his response to an unrelated incident, when Dr. Sandy found out about plaintiff's statements to Dr. Anil.)

## C.  Dr. Keil's Resignation

Dr. Karen Keil worked for defendant as a doctor in the department of obstetrics and gynecology from September 1996 until she resigned in about July 2006.  (The parties dispute whether Dr. Keil told Dr. Sandy soon after he started in 2004 that she, plaintiff and other female doctors, were concerned about what they saw as gender bias in the compensation system and whether, after that, Dr. Sandy "became increasingly irritated" with Dr. Keil.)

In March 2005, during Dr. Keil's annual performance review, Dr. Sandy asked her when she was planning on retiring.  Dr. Keil was 44 years old at the time.  At Dr. Keil's March 2006 performance review, Dr. Sandy told her that she was the subject of seven

nursing complaints and then asked that she be put on a performance improvement plan. Dr. Sandy had never seen the complaints, but had only heard about them from Diane Holmay. (The parties dispute whether Dr. Sandy took a condescending and accusatory tone at the meeting.) Dr. Keil was unaware of the complaints and asked to see written copies of them; however, Dr. Sandy and hospital administration refused to provide her with the documentation despite her repeated requests. Dr. Keil did not submit to a performance improvement plan, but instead submitted her resignation effective June 2006.

### D. Plaintiff's Resignation

#### 1. Behavioral history

Starting at least in 2001, plaintiff had problems interacting with patients and nurses. From 2001 to 2003, at least two nurses and one patient complained about plaintiff's behavior and communications. In the same time period, a Dr. Margaret Grenison recommended that plaintiff be relieved of her duties at the hospital for her behavior. In 2003, the nursing director for the department of obstetrics and gynecology kept a log listing complaints against plaintiff and concerns about her behavior. The log included more than 20 entries, many describing incidents involving plaintiff's negative attitudes, negative comments, failure to communicate or disrespectful behavior.

In 2004, Bonny Young became the nursing director for the department of obstetrics

9

and gynecology.  Her responsibilities included supervising nursing and other staff in labor and delivery.  She was warned by the former director that there were continuing concerns with plaintiff's interactions with nurses and patients.  From 2004 to 2006, plaintiff continued having problems with nursing staff and several nurses complained to Young about her treatment of them.  These complaints included plaintiff's refusal to provide information to a nurse, plaintiff's ongoing passive-aggressive treatment of a lead nurse and plaintiff's verbal abuse and humiliation of at least two other nurses.

In March 2006, Dr. Sandy and Holmay noted during plaintiff's annual performance review that her communication problems had shown improvement and indicated that plaintiff was a "valuable member" of the department.  However, starting again in June 2006, Young received new complaints about plaintiff's behavior and communication, including complaints that plaintiff refused to provide pain medication to a patient while plaintiff was on call, humiliated and verbally abused a number of nursing staff members, told one nurse to "go hit" another nurse for her and told a patient after her cesarean section that she had "made yesterday horrible for everyone."  (Plaintiff disputes some of the minor details related to the underlying incidents complained about, but she does not deny that these complaints were made about her behavior and she admits to most of the underlying facts.)

In early September 2006, Holmay asked Young to compile a timeline of plaintiff's "unacceptable behaviors" in preparation for taking a recommendation to the personnel

executive committee.  Young compiled a timeline listing complaints from 2004 until October 2006.  No one directed Holmay to ask for the timeline.  (Plaintiff attempts to dispute this fact by submitting evidence that Dr. Sandy directed Holmay; however, the multiple pages of deposition testimony that plaintiff cites do not include any testimony that Dr. Sandy or anyone else ever directed Holmay to ask for the timeline.)

Starting in early September, after plaintiff had met with Tiggelaar regarding compensation, Dr. Sandy stopped including her in conversations regarding the recruiting of the department.  It had been his custom to meet with plaintiff before recruitment meetings to talk with her about potential recruits.

In late September 2006, defendant was attempting to recruit Dr. Gokhan Anil.  Dr. Sandy received a phone message from Dr. Anil's recruiter that plaintiff had made negative comments about defendant to Dr. Anil during the interview process, including statements that she was not listened to when critical about nurses, administration and compensation, that she might be gone by the time Dr. Anil took a position and that she would not presently accept a position at the hospital "knowing what she knows now."  (Plaintiff does not deny that Dr. Anil told Dr. Sandy that plaintiff had made these comments; instead, she simply points out that Dr. Sandy did not "witness" her making these comments.)  On October 4, 2006, Dr. Sandy met with plaintiff to discuss her conversation with Dr. Anil.  The same day, Dr. Sandy sent plaintiff a letter on the matter.  After that letter, Dr. Sandy avoided plaintiff,

11

no longer coming into her office or even speaking to her.

On October 23, 2006, Holmay sent Dr. Margaret Grenisen an email regarding her proposed letter to the executive personnel committee recommending plaintiff's resignation. In the email, Holmay stated "Margaret, this looks good . . . I found two more supporting documents over the weekend, so we have plenty on her."

## 2. Termination proceedings

Defendant has a policy that provides a mechanism for reporting and managing issues involving a doctor's disruptive behavior.  If a doctor's behavior is "disruptive" as defined in the policy and if no "immediate action" is required, a written report "should" be prepared and provided to the doctor within seven days of the incident.  The policy is silent on the use of the disruptive behavior policy in the context of termination proceedings.

On or about October 31, 2006, Dr. Sandy and Holmay recommended to the personnel executive committee that plaintiff be relieved of her duties.  Before that meeting, Dr. Sandy, Holmay and Young submitted memoranda providing their reasons for the record. In addition, they submitted the timeline prepared by Young and the time log prepared in 2003 by the former nursing director.

Dr. Sandy stated at the meeting that plaintiff's most negative impact was her interaction with nursing staff and those in subservient positions.  Holmay discussed certain

12

nurses' hesitancy to contact plaintiff for fear of reprisal.  Dr. Krien, a member of the executive personnel committee, expressed dissatisfaction with plaintiff's interaction with Dr. Anil.   Dr. Sandy and Holmay recommended that the committee adopt their recommendations for the reasons provided in their memoranda.  The executive personnel committee voted unanimously to adopt the recommendation to relieve plaintiff of her duties.  The management committee met in November 2006 to discuss the executive personnel committee's recommendation and voted unanimously to relieve plaintiff of her duties.

On November 14, 2006, Drs. Nesse and Schultz and Holmay met with plaintiff to tell her that she was being relieved of her duties and could resign if she so chose.  Plaintiff submitted her resignation on November 15, 2006.  Although plaintiff had been aware of many of the incidents identified in the timeline and log at the time they occurred, Dr. Sandy never provided plaintiff with timely written reports for any incidents that could be considered "disruptive behavior."  He never provided plaintiff any warning or discipline for her behavior or threaten terminationed before he recommended her termination.  Plaintiff was not provided any of the documentation submitted to the executive personnel committee until after the termination proceedings were completed.

13

OPINION

A.  <u>Disparate Impact Claim</u>

Defendant devoted 22 pages of its opening brief challenging plaintiff's discrimination claim.  Arguing that plaintiff's claim was barred under the statute of limitations or under the doctrine of laches and was without merit, defendant focused throughout its brief on what it believed to be plaintiff's claim that defendant afforded plaintiff disparate *treatment*, including defendant's failure to change its shared delivery revenue system and special treatment of Dr. Steingraber.  In plaintiff's opposition brief, she responds in less than two pages that defendant's arguments are all wrong because plaintiff is not pursuing a claim for disparate treatment, but rather complains about the compensation system's disparate *impact* on women, which, unlike a disparate treatment claim, does not require a showing of *intent*.

It is questionable whether plaintiff ever identified a disparate impact claim in her complaint or in any discovery responses, but it is unnecessary to resolve that question. Defendant discussed more than a lack of intent in its lengthy argument.  Although defendant approached the law from the angle of disparate treatment, it identified case law from the circuit imposing strict limitations on disparate impact claims as well, dkt. #14, at 12-15 (citing <u>Lewis v. City of Chicago</u>, 528 F.3d 488 (7th Cir. 2008)), and it identified generally applicable case law on the issue of  laches, dkt. #14, at 20-21 (citing <u>Jeffries v. Chicago Transit Authority</u>, 770 F.2d 676 (7th Cir. 1985) and <u>Smith v. Caterpillar, Inc.</u>, 338 F.3d

14

730 (7th Cir. 2003)).

Plaintiff simply ignored these arguments, which was a mistake.  By failing to oppose defendant's contentions that her claim was time-barred, plaintiff has conceded the issue. Wojtas v. Capital Guardian Trust Co., 477 F.3d 924, 926 (7th Cir. 2007).  Regardless whether plaintiff's discrimination claim is framed in terms of disparate impact or disparate treatment, I will grant defendant's motion for summary judgment on that claim because it is barred both by the statute of limitations and by the doctrine of laches.

B.  Retaliation Claim

Title VII makes it an unlawful employment practice "for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 982 (7th Cir. 2004).  An employee may pursue a retaliation charge in one of two ways: 1) the direct method of proof, under which the employee must show that she engaged in a statutorily protected activity, that she suffered an adverse employment action and that a causal connection exists between the two, Nichols v. Southern Illinois University - Edwardsville, 510 F.3d 772, 785 (7th Cir. 2007); or 2) the indirect method of proof, which incorporates the burden shifting analysis in McDonnell Douglas Corp. v. Green, 411 U.S.

15

792 (1973).  Wyninger, 361 F.3d at 981.

Defendant has moved for summary judgment on the ground that plaintiff cannot show retaliation by either method of proof.  In response, plaintiff declined to offer any argument as to how retaliation may be established under the indirect method of proof, making only a single conclusory statement that the evidence is sufficient "[u]nder both of these methods."  (The statement appears in an introductory section, as though plaintiff had originally planned on laying out an argument for retaliation under the indirect method of proof but later decided against it.)  Again, plaintiff's failure to respond to defendant's arguments constitutes waiver.  Wojtas, 477 F.3d at 926.

This leaves the direct method of proof.  Plaintiff's theory is that she was forced into resignation because of the complaints she made about sex discrimination.  Of the three elements required to establish retaliation under the direct method, the parties agree on one: plaintiff's forced resignation constitutes an adverse employment action.  Defendant contends that plaintiff's complaints were not "statutorily protected" and had no causal connection to her forced resignation.

I move straight to the question whether a causal connection existed because it is dispositive.  Plaintiff identifies circumstantial evidence that she believes can allow a jury to infer the necessary causal connection: the timing of her forced resignation, the nature of her termination proceedings, the "glowing" review she was given months earlier, Dr. Sandy's

16

behavior shortly before the proceedings and Dr. Sandy's similar treatment of Dr. Keil.  Once put in context, none of plaintiff's circumstantial evidence supports an inference that a causal connection exists between plaintiff's complaints and her forced resignation.

Plaintiff contends that the timing of her forced resignation serves as "strong" evidence of retaliatory motive because Dr. Sandy and Holmay and Young started developing a case for her termination shortly after she complained about gender disparities to Tiggelaar.  The timing of an adverse action may often serve to strengthen an inference of retaliation.  Culver v. Gorman & Co., 416 F.3d 540, 546 (7th Cir. 2005) (citations omitted).  However, the timing that plaintiff identifies does not support such an inference.  Plaintiff's complaint to Tiggelaar was hardly her first.  According to plaintiff, she had been complaining about the compensation system for years:  Dr. Sandy found out about her dissatisfaction shortly after he arrived in 2004 and Holmay became aware of it at least by 2005, when she attended plaintiff's performance review.  Thus, any importance to be given to plaintiff's complaint to Tiggelaar must lie in the fact that it was made to *him*.  Plaintiff has offered no explanation why Tiggelaar's discovery of plaintiff's concerns would lead to retaliation against her.  It cannot be simply because Tiggelaar was a vice-president; plaintiff had already complained to Holmay, who was also a vice-president.  More important, plaintiff identifies Dr. Sandy and Holmay as the "driving forces" behind her termination proceedings.  Each of them already knew about plaintiff's complaints and neither of them knew that plaintiff

17

complained about gender bias when she spoke to Tiggelaar.

Nor can much be made of the nature of plaintiff's termination proceedings.  Plaintiff points out that defendant failed to follow its policy addressing "disruptive behavior" for the nursing and patient complaints that were used against her during termination proceedings. However, there is no evidence that the policy must be used to identify wrongful behavior before terminating a doctor on those grounds.  At most, the policy provides an avenue for a disciplinary proceeding based on a single incident of disruptive behavior.  Plaintiff does not suggest that defendant's failure to follow its policy is evidence that the underlying nursing and patient complaints are false; she has admitted that the complaints were made and admits many of the underlying facts regarding the complaints.  Plaintiff seems to contend that the nursing and patient complaints against her were never truly a "concern" until she complained about gender disparity.  However, the sheer quantity and similarity of complaints against her make it apparent that defendant's "concern" with plaintiff's behavior developed as a result of numerous incidents, regardless whether they were individually too minor to warrant pursuing under the disruptive behavior policy.

Plaintiff contends that her March 2006 annual review was "glowing" and that Dr. Sandy's and Holmay's recommendation in October 2006 that she be terminated on behavioral grounds was therefore suspicious.  In some circumstances an employer's "sudden dissatisfaction with an employee's performance after that employee engaged in a protected

18

activity may constitute circumstantial evidence of causation."  Culver, 416 F.3d at 546. Plaintiff's March 2006 review was hardly "glowing" and Dr. Sandy's and Holmay's position in October 2006 regarding her behavior was hardly a sharp turnaround.  Although plaintiff's review indicated that plaintiff had "improved" her communication with others and that she was a valuable member of the department, plaintiff was the subject of several new complaints regarding her treatment of nurses and patients from March 2006 to October 2006.

Next, plaintiff contends that a jury could infer retaliatory motive from Dr. Sandy's behavior shortly before the termination proceedings.  Although plaintiff has adduced evidence that Dr. Sandy was "annoyed" with plaintiff for going to Tiggelaar, that he stopped including her in recruitment conversations and that eventually he cut off all communication with her, the evidence would not support a finding of a connection between that behavior and plaintiff's alleged complaint of gender bias to Tiggelaar.  The record contains no evidence that Dr. Sandy knew that plaintiff complained of gender bias when she went to Tiggelaar.  Moreover, much of Dr. Sandy's change in behavior came in response to his finding out what plaintiff had said to Dr. Anil, which was unrelated to her complaint of gender bias.

As a final piece of evidence, plaintiff contends that Dr. Sandy's treatment of Dr. Keil suggests retaliatory motive in plaintiff's case because Dr. Keil also was subjected to discipline after complaining about gender bias in the compensation system.  However, plaintiff failed

19

to adduce sufficient evidence regarding the details of Dr. Keil's resignation to allow an inference to be drawn that Dr. Sandy retaliated against Dr. Keil.  It is undisputed that Dr. Sandy was "irritated" with Dr. Keil after she complained about gender bias, asked her when she was retiring one year later and put Dr. Keil on a performance improvement plan two years after that based on seven nursing complaints.  Dr. Keil was not pressured to resign and none of her complaints would have been effectively silenced by such a slow and soft response by Dr. Sandy.  It would be a stretch to infer that Dr. Sandy had a retaliatory motive for disciplining Dr. Keil in light of this evidence; it would be even more of a stretch to infer from his actions in Dr. Keil's situation that he had a retaliatory motive against plaintiff based on action she took.

In sum, plaintiff's evidence does not add up to retaliation.  There is no evidence of a causal connection between plaintiff's forced resignation and her alleged complaints of gender bias.  Therefore, defendant's motion for summary judgment will be granted as to plaintiff's retaliation claim.

ORDER

IT IS ORDERED that defendant Franciscan Skemp Healthcare, Inc.'s motion for summary judgment, dkt. #11, is GRANTED.  The clerk is directed to enter judgment in

20

favor of defendant and close this case.

Entered this 27th day of January, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge